# IN THE COURT OF APPEALS OF IOWA

No. 23-0106
Filed April 12, 2023

**IN THE INTEREST OF K.M.,**
**Minor Child,**

**D.M., Father,**
 Appellant,

**M.C., Mother,**
 Appellant.
_____

 Appeal from the Iowa District Court for Des Moines County, Jennifer S. Bailey, District Associate Judge.

 A mother and father separately appeal the termination of their parental rights to one child. **AFFIRMED ON BOTH APPEALS.**

 Kimberly A. Auge of The Auge Law Firm, Fort Madison, for appellant father.

 Brent Ruther, Burlington, for appellant mother.

 Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

 Ryan D. Gerling of Cray Law Firm, Burlington, attorney and guardian ad litem for minor child.

 Considered by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

A mother and father separately appeal the termination of their parental rights to one child, K.M. Both parents maintain the statutory ground is unsatisfied, reasonable efforts were not provided, termination is not in the child's best interests, guardianship would have been more appropriate, and their parent-child bonds merit an exception to termination. The mother also argues she should have been granted an extension of time. Upon our de novo review, we affirm termination of their parental rights to K.M.

## I. *Background Facts and Proceedings.*

The Iowa Department of Health and Human Services became involved with K.M. in October 2020. She was less than one year old, having been born in December 2019. Both of her parents admitted being active methamphetamine users, although they denied ever supervising K.M. while under the influence. K.M. was placed with her paternal great-grandmother. Due to her parents' lack of progression in the case, the court adjudicated K.M. as a child in need of assistance (CINA) in March 2021.

By the time of a dispositional hearing in July, the father obtained a substance-abuse evaluation, had meaningful visitation with K.M., and entered into a father-child inpatient treatment facility. He also reported his first clean drug test on June 9. K.M.'s mother was in the Des Moines county jail and not a suitable placement option. Based on these findings, the court placed K.M. with her father at the treatment facility, conditioned on his continued participation in inpatient substance-abuse treatment and in all recommended aftercare services.

The father was successfully discharged from the facility on August 11 with specific aftercare expectations, including recovery meetings, counseling, and frequent drug testing. The father had indicated he would be discharging to his grandmother's home. Instead, he placed K.M. with her paternal great-grandmother and left town. After two missed drug tests, the father admitted to relapsing on methamphetamine and tested positive for amphetamines on a rapid test on August 30. On September 1, the court entered an ex-parte removal order, finding K.M.'s immediate removal from her father's care was necessary due to his noncompliance. Due to her failure to report the father's absence, the court also removed K.M. from her paternal great-grandmother at that time.

Later in September, K.M.'s paternal great-grandmother petitioned to intervene and requested that she be made a party to the proceedings. The court denied this petition at a review hearing in November, finding the paternal great-grandmother provided disingenuous testimony, feigned confusion and ignorance, and actively sought to conceal the father's violation of the court's custodial decree. At this hearing, the court noted the mother was attending outpatient treatment and reportedly complying with probation. Meanwhile, the father was living with a paramour who was likewise attempting recovery from illegal substances.

The paternal grandfather and his wife also petitioned to intervene in the case. Although they filed the motion in October, the matter was continued twice by agreement of the parties and eventually scheduled for hearing on March 1, 2022. In the interim, the paternal grandfather suffered a series of strokes. Due to his health condition, the couple withdrew their motion to intervene.

At the review hearing in March, the court found the mother was involved in substance-abuse treatment, attending visits, had her own apartment, and was employed. She completed a mental-health evaluation in November 2021 but had not started treatment, reportedly due to long waiting lists. As for the father, he started extended outpatient treatment in November, was living with his grandmother, and was employed full-time. He had a series of drug tests conducted through urine, sweat, and hair that returned negative for illegal substances. He also completed a mental-health evaluation in November. He was recommended to attend NA meetings regularly, have trauma-focused psychotherapy, and follow medication recommendations. Based on the substantial progress demonstrated, the court granted a six-month continuance.

From March to May, the father had a series of drug tests return positive for methamphetamine. During this time, the mother graduated to unsupervised overnight visits, while the father's visits regressed to full supervision due to the positive drug tests. The parents were living together again at this time. The foster parents reported a very positive relationship with K.M.'s parents. Later in May, the parents reported that they had ended their relationship and that the father had moved back into his grandmother's home.

The mother also relapsed on methamphetamine in May. She blamed her relapse on stress. It was previously recommended that she engage in mental-health counseling to manage her stress and mental-health diagnoses. The mother attended approximately four or five counseling sessions earlier in 2022 but was put back on a waiting list after missing too many appointments. In July, the mother requested the department's assistance in obtaining a bed space in an inpatient

facility for substance-abuse treatment. The court granted her request, directing the department to aid her to the extent possible. It appears that she did not enter inpatient treatment until September.

On August 10, the State filed a petition to terminate both the mother and father's parental rights. The father participated in drug testing on August 18, from which the sweat patch returned positive for methamphetamine, but the hair stat came back negative. The father obtained an independent hair stat in September that returned negative for methamphetamine. A hearing on permanency and termination occurred over the span of two days: October 4 and October 18. On the first day of the hearing, K.M.'s paternal grandfather and his spouse renewed their petition to intervene previously filed in this matter. The court held a hearing on intervention on December 13. On January 6, 2023, the court issued an order terminating the mother and father's parental rights to K.M. On January 19, the court denied the petition to intervene. Both parents filed timely appeals.

## II.    Review.

Our review of termination proceedings is de novo. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination. Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015) (internal citation omitted). We give weight to the juvenile court's fact findings, especially those about witness credibility, although they are not binding. *See* Iowa R. App. P. 6.904(3)(g); *C.B.*, 611 N.W.2d at 492.

### III.    Discussion.

The principal concern in termination proceedings is the child's best interests. *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019). Iowa courts use a three-step analysis to review the termination of parental rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). Those steps include whether: (1) grounds for termination have been established, (2) termination is in the child's best interests, and (3) we should exercise any of the permissive exceptions to termination. *Id.* at 472–73.

*A. Grounds for Termination.*

The juvenile court found the State proved by clear and convincing evidence that termination of the mother and father's parental rights was appropriate under the substantive elements of paragraph (h) of Iowa Code section 232.116(1) (Supp. 2022). However, the court's termination order cites paragraph (g). The State concedes termination was not appropriate under paragraph (g) but argues this citation was merely a typographical error. The State's petition clearly identified and was based on paragraph (h). The court's termination order substantively analyzes the elements of paragraph (h) by making factual findings that K.M. is three years of age or less, has been adjudicated as a CINA, has been removed from parental care for the requisite period of time, and cannot be returned to the custody of her parents without further exposing her to adjudicatory harm.[1] The mistake is not dispositive and does not preclude us from affirming upon the correct

---

[1] The mother's petition argues that the juvenile court erred when it did not specify under what CINA grounds K.M. would be subject to adjudicatory harm if returned to the mother's care. The juvenile court's termination order on pages 26 and 27 makes findings that K.M. would be subject to adjudicatory harm under multiple CINA grounds if returned to her "home." These findings are not subdivided out as to one or the other parent, and we find them applicable to both parents.

ground. *See In re M.W.*, 876 N.W.2d 212, 221 (Iowa 2016) (holding a district court may be affirmed on grounds upon which it did not rely if those grounds were presented to the district court).

Turning then to the substance of paragraph (h), the parents only contest satisfaction of the fourth element: whether the child could be returned to the parent's care at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the term "at the present time" to mean "at the time of the termination hearing"). Due to both parents' ongoing abuse of methamphetamine, we find there was clear and convincing evidence as to both parents that K.M. could not be immediately returned to their care. *See In re M.M.,* 483 N.W.2d 812, 814 (Iowa 1992) ("[A] child cannot be returned to the custody of the child's parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication."); *see also In re J.S.*, 846 N.W.2d 36, 37 (Iowa 2014) (holding that it is reasonable for the court to conclude a parent's active addiction to methamphetamine amounted to an adjudicatory harm).

The mother voluntarily admitted relapsing on methamphetamine approximately five months before the termination hearing and continuing to "dabble" until she was incarcerated within one month of the termination hearing. At the hearing, she testified that she attempted to start inpatient treatment on September 13 but left the same day. She has not otherwise participated in any substance-abuse or mental-health treatment since relapsing.

The father claimed to have been sober since October 2021. Since this alleged sobriety date, the father provided seven drug tests positive for

methamphetamine—five of which occurred since the six-month case extension granted in March. He questioned the accuracy of the tests and offered various reasons for his positive results, such as being exposed to it by helping somebody move out of his grandmother's house, being extremely overweight and sweating too much in the heat, and the mother drugging him.

There was a series of text messages between the parents entered into evidence wherein the mother admitted to drugging the father's coffee. However, the mother testified that the father asked her to send those messages because he would have a better chance of getting their daughter back. The father also provided a negative drug test from a hair stat in late September 2022. However, this test does not prove his prior patch tests were inaccurate. At the hearing, the mother denied telling the caseworker that the father had used methamphetamine within the last six months and dyed his hair to manipulate drug tests. Ultimately, the juvenile court found the father was not credible, and we are not inclined to overrule that finding on this record.

It is well established that "a parent's methamphetamine addiction by itself can result in 'harmful effects' to the child, thereby justifying state intervention to protect the child." *J.S.*, 846 N.W.2d at 37. Therefore, we agree with the juvenile court's conclusion that K.M. could not be returned to either of her parents at the time of the termination hearing. We find clear and convincing evidence to support termination of both the mother and father's parental rights under paragraph (h) of Iowa Code section 232.116(1).

*B. Reasonable Efforts.*

The parents both argue the department did not make reasonable efforts at reunification. *See* Iowa Code § 232.102(6) (requiring that the department "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child"). However, the mother does not point to any portion of the record where she identified a deficiency in agency services or requested any additional services prior to the filing of the petition for termination. Therefore, the mother's argument is untimely. *See In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding."); *T.S.*, 868 N.W.at 425 ("While the State has an obligation to provide reasonable services to preserve the family unit, it is the parent's responsibility 'to demand other, different, or additional services *prior* to the termination hearing.'" (citation omitted)).

On the other hand, the father argues he requested additional services that went unfulfilled. He requested a parent partner and video visitations at review hearings held in October 2021 and March 2022.[2] The court directed the department to provide the requested services. The record reflects that video visitation ensued, but the father states that he never received a parent partner. The record reflects that a parent partner was present at meetings and court

---

[2] The father also argues there was an arbitrary delay in hearing his father and step-mother's motion to intervene that resulted in the loss of critical time when they could have been receiving services for K.M. He lacks standing to advance this argument. *See In re S.P.*, No.19-0069, 2019 WL 1294178, at *2 (Iowa Ct. App. March 20, 2019) (finding a parent lacks standing to challenge the denial of a grandparent's request to intervene).

proceedings after the request. However, it is unclear whether this individual was the mother's parent partner. A caseworker report from May 2021 reflects that the worker put in a referral to the parent partner program for both parents. The father testified at the termination hearing that he never had a parent partner because there were no males in the program. While this shortcoming is unfortunate, we do not find it constitutes a violation of the reasonable-efforts requirement when we look at the totality of services provided. *See In re C.D.*, No. 18-0044, 2018 WL 1863290, at *6–7 (Iowa Ct. App. April 18, 2018) (finding the failure to provide a parent with a parent partner did not violate the reasonable-efforts requirement).

*C. Best Interests.*

To evaluate the child's best interests, "the court shall give primary consideration to the child's safety, to the best placement for furthering the long term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The "defining elements" of the best-interests analysis are the child's safety and "need for a permanent home." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted). "[I]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *A.S.*, 906 N.W.2d at 474. "The 'legislature has established a limited time frame for parents to demonstrate their ability to be parents.'" *Id.* (citation omitted).

Here, neither parent has demonstrated their ability to be stable and sober parents. They have not adequately addressed their issues with substance abuse. The mother was in and out of jail several times over the course of this case and

ultimately released on probation with a ten-year suspended sentence. The father was also on probation for a five-year suspended sentence. The caseworker testified that the father has threatened her and can be very angry, irrational, and deceptive. He was diagnosed with intermittent explosive disorder, among other mental-health conditions. The court found the father fabricated his social history to explain his addiction and appear more sympathetic. By the time of the termination hearing, both parents' visits with K.M. were restricted to full supervision, and she had been removed from their care for over two years—except for the forty-one day period in her father's care. On this record, clear and convincing evidence shows that termination of both her mother and father's parental rights is in K.M.'s best interests.

*D. Extension of Time.*

The mother requests more time to achieve reunification. Under Iowa Code section 232.104(2)(b), the court can continue the child's placement for another six months if doing so will eliminate the need for the child's removal. The court must "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b).

We view termination proceedings with a sense of urgency once the time provided in section 232.116(1) passes. *See C.B.*, 611 N.W.2d at 494–95. When the court first adjudicated K.M. as a CINA in March 2021, it clarified that the permanency timeline would commence from the time of adjudication despite K.M. having already been removed from her parents' care for nearly five months. The

parents thereafter received one six-month extension in April 2022. After unraveling the progress that generated that extension, we are not convinced another one will produce a different result. Based on the mother's history, we cannot find the need for removal will no longer exist if she is allowed six more months. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (noting a parent's past performance shows the quality of the future care that parent may provide). We thus decline to apply section 232.104(2)(b) to delay permanency.

*E. Guardianship.*

Both parents argue the court should have placed K.M. in a guardianship. The mother requested guardianship with K.M.'s maternal great-uncle, while the father sought placement with K.M.'s paternal grandfather and step-grandmother. The maternal great-uncle reached out to the department six weeks prior to the start of the termination hearing despite multiple relative letters being sent out, with the first letter at least eighteen months prior. There was no record of his involvement in the case or K.M.'s life. Because he did not return the background-check paperwork until the week of the hearing, the department could not recommend guardianship with the maternal great-uncle. As for the paternal grandfather, he testified his health condition prevented him from following through with his petition to intervene earlier. The juvenile court declined to order a guardianship because the testimony of the paternal grandfather and his wife demonstrated a "fundamental blindness to the manipulation of [K.M.'s father]." When questioned regarding the discretion they would be afforded in a guardianship, the paternal grandfather testified he would require regular drug testing. However, he and his

wife also testified that they would be able to tell when the father was using methamphetamine but expressed surprise at his recent positive tests.

Moreover, our courts do not prefer guardianship over adoption. *A.S.*, 906 N.W.2d at 477. As our supreme court has noted, a guardianship requires annual reports to the court until the child reaches the age of majority. *Id.* at 477–78. Until that time, the court may end the guardianship or appoint a different guardian. *Id.* at 478. For that reason, a guardianship inherently offers less permanency than adoption. *But see In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017) (holding, under the specific facts of that case, that placing the child in a guardianship with his grandmother was no less permanent than requiring the grandmother to adopt). If termination is appropriate, a relative's willingness to take the child will not change that. *See A.S.*, 906 N.W.2d at 475. The deciding factor is the child's best interests. *See id.* The child's grandparents or other relatives may seek to adopt her, and the department will determine the appropriate adoptive parents. Having considered K.M.'s best interests, we decline to order guardianship.

*F. Exception for Bond.*

Finally, both parents seem to advance arguments that an exception to termination should be granted because the parent-child bond that they each share with K.M. outweighs the need for termination. *See* Iowa Code § 232.116(3)(c) (providing a discretionary exception to termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The provisions of section 232.116(3) are "permissive, not mandatory," and the parent bears the burden to prove the applicability of an exception to termination. *A.S.*, 906 N.W.2d

at 475–76.  A family support specialist testified as to the bond K.M. shares with both her mother and father but further testified that neither of them have shown a period of sobriety such that K.M. should be returned to their care.  Despite each parent's love for their child, "our consideration must center on whether the child will be disadvantaged by termination."  *D.W.*, 791 N.W.2d at 709.  We do not find a parent-child relationship so strong that it outweighs the need for termination.  *See In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021) (finding the existence of a bond is insufficient when parents have "failed to provide the clear and convincing evidence necessary to show that, on balance, that bond makes termination more detrimental than not").

## IV.    Disposition.

Having reviewed both parents' arguments regarding the statutory ground, reasonable efforts, best interests, extension of time, guardianship, and an exception for the parent-child bond, we find each without merit and affirm termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**